```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLIE WEBB                  :      CIVIL ACTION
                                :
          v.                    :
                                :
CITY OF PHILADELPHIA            :      NO. 05-5238
```

MEMORANDUM

Bartle, C.J.                                       June 27, 2007

      This case involves claims by a Muslim female police officer whose requests to wear a khimar while on duty were denied by her supervisors.

      Before the court is the motion of the defendant City of Philadelphia for summary judgment on Count I of the complaint in which plaintiff Kimberlie Webb alleges religious discrimination under Title VII of the Civil Rights Act of 1966, 42 U.S.C. § 2000(e), and on Count II in which she avers retaliation and hostile work environment also under Title VII.[1]  See Fed. R. Civ. P. 56.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

I.

      The material facts are undisputed.  Plaintiff, a practicing Muslim, has been employed by the City of Philadelphia as a police officer since 1995.  On February 11, 2003, she sent a memorandum to Captain Michael Murphy, her commanding officer, in

---

1. We previously granted summary judgment with respect to the remainder of plaintiff's complaint.

which she stated her religion required that she cover her hair and requested permission to wear a headpiece called a khimar while in uniform.  The khimar is a traditional garment worn by Muslim women which covers the hair, forehead, sides of the head, neck, shoulders, and chest and sometimes extends down to the waist.  Plaintiff intended to wear the lower portion of the khimar tucked inside of her police shirt and to wear her police hat.  Although some Muslim women also cover their faces leaving only a slit for their eyes, plaintiff was not seeking to do so at that time.  The Captain denied her request to wear a khimar as a violation of Philadelphia Police Department Directive 78, which describes in detail the approved uniform for Philadelphia police officers.  Nothing in the directive authorizes the wearing of religious symbols or clothing as part of the uniform.

On February 28, 2003, plaintiff filed a complaint for religious discrimination with the Equal Employment Opportunity Commission ("EEOC").  On August 12, 2003, while the matter was pending before the EEOC, plaintiff decided to "take a stand" by appearing for work wearing a khimar in the manner described above.  A lieutenant on duty asked her to remove it, but she refused.  Captain Murphy thereupon informed her that she would not be permitted to work unless she complied with Directive 78.  She refused to obey his order and was sent home.  On August 13 and 14, she again appeared at roll call wearing the khimar, and when she declined to take it off, she was prohibited from

working.  Thereafter, she arrived for work without the khimar and was allowed to carry out her duties.

Disciplinary charges were instituted against plaintiff for insubordination and neglect of duty on August 13 and 14 for refusing to obey the order of her commanding officer to remove her khimar.  In accordance with normal procedures, she received an evidentiary hearing before a police board of inquiry.  It found plaintiff guilty and recommended to Police Commissioner Sylvester Johnson that she be suspended.  After review of the matter, the Commissioner, himself a Muslim, suspended her for 13 days.  Plaintiff did not grieve the discipline.

She filed an amended charge with the EEOC on August 4, 2004 in which she added allegations of retaliation to her previous charge of religious discrimination.  Specifically, plaintiff claimed that the following actions were retaliatory: (1) being sent home from work on August 12, 13 and 14 after refusing to remove her khimar; (2) suspension without pay for thirteen days in March 2004 as a result of wearing her khimar to work; (3) temporary removal from the "Safe Streets" detail where she had worked overtime; (4) transfer to a different work shift in January 2004; (5) the failure to notify her in time to attend a January 2004 awards ceremony where she was to receive a merit award; (6) a referral to the department's counseling program; and (7) a poor performance evaluation in April 2004 for allegedly

abusing sick leave.[2]  The EEOC issued a right-to-sue letter on July 8, 2005, and plaintiff filed her complaint in this court on October 5, 2005.[3]

## II.

Plaintiff maintains that the City's refusal to permit her to wear a khimar while in uniform and on duty constitutes religious discrimination under Title VII.  42 U.S.C. § 2000e-2(a)(1).  The City counters that it was simply requiring her to obey Police Department Directive 78, which has been in effect for 30 years and prescribes in detail the uniform as well as various grooming requirements for Philadelphia police officers.  The Directive does not authorize the wearing of religious symbols on the uniform or the wearing of religious apparel while on duty.

Police Commissioner Johnson's uncontradicted deposition testimony sets forth in detail the purposes of Directive 78.  It reflects the fact that the police force is a para-military organization in which personal preferences must be subordinated to the overall policing mission which requires the utmost cooperation among all officers.  The uniform promotes that

---

2.  Plaintiff also initially alleged that she was retaliated against when she was disciplined for failure to maintain her driver's license and for failure to secure property during an arrest.  She has since withdrawn these additional claims of retaliation.

3.  Although the amended charge was not considered by the EEOC because of administrative error on the part of the Commission, it was properly filed by plaintiff, and we do not penalize her for the Commission's error.  See Anjelino v. New York Times Co., 200 F.3d 73, 96 (3d Cir. 1999).

cooperation, fosters esprit de corps, emphasizes the hierarchical nature of the police force, and portrays a sense of authority to the public.  The wearing of religious symbols or clothing would undermine these purposes and has the potential for interfering with effective law enforcement and even for causing harm to officers in a diverse community such as Philadelphia.  According to the Commissioner, it is essential that the police maintain political and religious neutrality as they carry out their duties and must be seen by the public as not favoring one group or faith over another.  Directive 78 is designed to achieve these goals.

Title VII prohibits an employer from discriminating against an employee on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).  The statute defines religion to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

To establish a prima facie case of religious discrimination, an employee must demonstrate that:  "(1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement."  Shelton v. Univ. of Medicine & Dentistry of New Jersey, 223 F.3d 220, 224 (3d Cir. 2000).  Plaintiff has made out her prima facie case.  The burden of going

forward thus shifts to her employer, the City of Philadelphia, to demonstrate "that it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship." Id.  The burden of persuasion remains at all times on the plaintiff.  Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006).

       The City concedes that it has not offered plaintiff a reasonable accommodation.  Instead, it asserts in its defense that it would suffer an undue hardship if it were required to accommodate her.

       The Supreme Court in Trans World Airlines v. Hardison, held that undue hardship exists if an employer is required "to bear more than a de minimus cost" to make a reasonable accommodation."  432 U.S. 63, 84 (1977).  The cost, however, does not have to be economic.  In United States v. Board of Education, 911 F.2d 882 (3d Cir. 1990), our Court of Appeals faced a challenge under Title VII to the Pennsylvania Garb Statute. Alima Reardon, a devout Muslim and substitute teacher, had been told that she could not wear "a head scarf which covered her head, neck, and bosom leaving her face visible and a long loose dress which covered her arms to her wrists."  Id. at 884.  The Garb Statute provides:

> That no teacher in any public school shall
> wear in said school or while engaged in the
> performance of his duty as such teacher any
> dress, mark, emblem or insignia indicating
> the fact that such teacher is a member or
> adherent of any religious order, sect or
> denomination.

24 Pa. Stat. Ann. § 11-1112; Board of Education, 911 F.2d at 885. According to the statute's legislative purpose, as set forth in its original preamble: "It is important that all appearances of sectarianism should be avoided in the administration of public schools of this Commonwealth." 1895 Pa. Laws page no. 395. Board of Education, 911 F.2d at 893. The Court of Appeals determined, on a motion for summary judgment, that the School Board of Philadelphia had not engaged in religious discrimination against Reardon in violation of Title VII. It reasoned that it would be an undue hardship for the School Board to accommodate her because the Commonwealth regards "the wearing of religious attire by teachers while teaching as a significant threat to the maintenance of religious neutrality in the public school system." Id. at 894.

In Goldman v. Weinberger, 475 U.S. 503 (1988), the Supreme Court was presented with the question whether the Government violated the First Amendment rights of an Air Force Officer, an Orthodox Jew, who served as a military psychologist, when a regulation prohibited him from wearing a yarmulke while in uniform. The Supreme Court held that no constitutional violation occurred. It recognized the compelling need for uniformity in the military with the subordination of personal identities to the "overall group mission."

The Supreme Court had occasion to pass upon a regulation of the Suffolk County, New York Police Department restricting the length of the hair of its officers, although

religious discrimination was not an issue. Kelley v. Johnson, 425 U.S. 238 (1976). The Court of Appeals had ruled that the regulation interfered with an officer's personal liberty under the Fourteenth Amendment. The Supreme Court reversed. In deciding that no constitutional violation had occurred, it explained:

> The overwhelming majority of state and local police of the present day are uniformed. This fact testifies to the recognition ... that similarity in appearance of police officers is desirable. This choice may be based on a desire to make police officers readily recognizable to the members of the public, or a desire for the esprit de corps which such similarity is felt to inculcate within the police force itself.

425 U.S. at 248.

While neither of these two Supreme Court decision involved religious discrimination under Title VII, both gave deference to governmental regulations governing the grooming and attire of those who serve in the military and on a local police force. These precedents, together with our Court of Appeals decision in Board of Education and the undisputed testimony of Police Commissioner Johnson, inform our reasoning here.

In Board of Education, as noted above, the court held that enforcement of the Garb Statute did not constitute religious discrimination under Title VII because its purpose was to maintain religious neutrality in the public schools, and it would impose an undue hardship to accommodate Reardon and others similarly situated. Board of Education, 911 F.2d at 894. Like

-8-

the Garb Statute, Police Directive 78 has a compelling public purpose.  It recognizes that the Police Department, to be most effective, must subordinate individuality to its paramount group mission of protecting the lives and property of the people living, working, and visiting in the City of Philadelphia.  The Directive's detailed standards with no accomodation for religious symbols and attire not only promote the need for uniformity, but also enhance cohesiveness, cooperation, and the esprit de corps of the police force.  Prohibiting religious symbols and attire helps to prevent any divisiveness on the basis of religion both within the force itself and when it encounters the diverse population of Philadelphia.  Like the Garb Statute, Police Directive 78 is designed to maintain religious neutrality, but in this case in a para-military organization for the good not only of the police officers themselves but also of the public in general.  Under the circumstances, it would clearly cause the City an undue hardship if it had to allow plaintiff to wear a khimar.  Indeed, the case for Directive 78 appears even stronger than under the Garb Statute in light of the Supreme Court's rulings in Goldman and Kelley.

Our Court of Appeals' decision in Fraternal Order of Police v. City of Newark, 170 F.3d 359 (3d Cir. 1999) is not to the contrary.  The plaintiffs were Muslim police officers whose religious beliefs mandated that they grow beards.  The issue presented was whether the Newark Police Department policy prohibiting beards contravened the free exercise clause of the

First Amendment when it made an exception for those with certain medical conditions. The court held that the policy violated the Constitution by allowing beards for secular but not religious reasons. Here, in contrast, Philadelphia Police Directive 78 bars the wearing of religious dress or symbols under all circumstances when a police officer is in uniform. It has no medical or secular exceptions.

      The City of Philadelphia has established compelling non-discriminatory reasons for Directive 78 and has demonstrated as a matter of law that it would suffer an undue hardship if required to accommodate the wearing of a khimar by the plaintiff while on duty as a police officer. Accordingly, the motion of the City for summary judgment on Count I under Title VII alleging religious discrimination will be granted.[4]

---

4. Plaintiff additionally alleges that she was discriminated against because the Police Department favors members of the Christian faith. For this proposition, she cites the deposition testimony of another police officer who claims to have observed "[A] few [officers] that may have a cross on their lapel, like a lapel pin. ... Or maybe a necklace." Bilal Dep. 48:7-10, September 14, 2006. Officer Bilal also claims to have seen some officers wear ashes on their foreheads on Ash Wednesday each year. Plaintiff, however, fails to provide the identity of any of these officers as well as any times or locations where such incidents may have taken place. Moreover, she does not offer any evidence that the supervisors of these officers or the Police Commissioner condoned or were even aware of these alleged actions. Without any such evidence, the vague and conclusory statements of one witness are insufficient to overcome the City's motion for summary judgment on this question.

III.

Plaintiff contends in Count II of her complaint that the City retaliated against her for engaging in the protected activity of wearing her khimar to work in August 2003 and that such retaliatory activity created a hostile work environment, in violation of Title VII.[5]  Although we have already determined her religious discrimination claim against her, that decision is not dispositive of her claim for retaliation.  The Court of Appeals has explained that "[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct.  Thus, a plaintiff need not prove the merits of the underlying discrimination complaint, but only that [s]he was acting under a good faith, reasonable belief that a violation existed."  <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1085 (3d Cir. 1996) (internal citations and quotations omitted).

To survive a summary judgment motion on a retaliation claim a plaintiff must establish a prima facie case by demonstrating that:  (1) she engaged in protected activity; (2) the employer took adverse employment action against her; and (3)

---

5. In her complaint, plaintiff identified the protected activity she engaged in as the filing of the February 28, 2003 charge with the EEOC.  She later changed course and now declares that "the protected activity at issue in the instant matter was not the filing of a claim of discrimination with the EEOC on [sic] February 2003 ....  In contrast, the protected activity at issue here took place on August 12-14, 2003 when Plaintiff wore her khimar to work."  Pl.'s Mem. in Opp. at 17.  Because her present contention is within the scope of what Title VII prohibits, we will consider it.  42 U.S.C. § 2000(e)-3(a); <u>see</u> <u>also</u> <u>Moore</u>, 461 F.3d at 341 (3d Cir. 2006).

-11-

there was a causal connection between her participation in the protected activity and the adverse employment action.  Moore, 461 F.3d at 342.  Once the employee establishes a prima facie case, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct.  Id. at 342.  If the employer does so, it is entitled to summary judgment unless the employee is able to point to some evidence from which a reasonable fact finder could conclude that the employer's explanation was false and that the real reason for the action was retaliation.  Id.  The burden of proof always rests on the plaintiff.  Id.

  Plaintiff first claims that she was retaliated against when she was sent home from work on August 12, 13 and 14, 2003 after declining to remove her khimar when ordered to do so.  She asserts that this retaliation continued when she was suspended without pay for thirteen days in March 2004.  The City argues that plaintiff was being insubordinate when she admittedly refused to obey her supervisor's direct order to comply with Directive 78.  It maintains that her supervisors were entitled to send her home and take further disciplinary action in response.  She has put forward no evidence to suggest that this explanation was false.  Instead, she merely reiterates the contention of her discrimination claim that Directive 78 was unlawful.  We have already determined to the contrary.  When plaintiff's supervisors sent her home and disciplined her, they were merely enforcing Directive 78 as written, with no hint of retaliatory motive.

Since she does not dispute this, the City has successfully put forward a legitimate, non-discriminatory reason for its conduct.

Second, plaintiff avers that her temporary removal from the "Safe Streets" detail where she worked overtime was retaliatory. A memorandum from Lieutenant John McCloskey, dated February 6, 2003, documents his recommendation that she be taken off the Safe Streets detail. The request was approved the same day by the Commanding Officer. It is axiomatic that for an adverse employment action to be retaliatory, it must occur after the employer was aware that the employee had engaged in protected activity. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272-73 (2001). Plaintiff did not make her written request to wear her khimar while on duty until February 11, 2003, and the "protected activity" she engaged in did not happen until August 2003. Consequently, there is no possibility that her removal from the Safe Streets program could have been retaliatory. Plaintiff simply cannot make out a prima facie case for this claim.

Plaintiff next argues that her temporary transfer to a different work shift in January 2004 and the issuance of a poor performance evaluation for her in April 2004 were retaliatory. The City counters that both the transfer and the evaluation were justified by the fact that she had low "activity numbers" at night and poor attendance. She contends that her attendance never formally violated the Department's sick leave policy. However, she does not dispute that she had low activity numbers

or that her supervisors informed her that the reason for the shift change and performance evaluation was her low activity numbers and poor attendance.  Again, plaintiff has not overcome the City's proffered legitimate, non-discriminatory reason for its actions.

Plaintiff further asserts that her referral to the Police Department's Employee Assistance Program ("EAP") was made in retaliation for her protected activity.  As part of her prima facie case, she must show that an adverse employment action was taken against her.  Moore, 461 F.3d at 340-41.  The EAP is a counseling program that helps employees manage job-related stress, solve personal problems, and deal with addictive or suicidal behaviors.  Referral to the Philadelphia Police Department's EAP is a non-punitive action.  EAP use by the officers is voluntary and does not appear on their employment record.  Because plaintiff does not even allege otherwise, she cannot make out a prima facie case on this claim.

Plaintiff additionally contends that she was retaliated against when her supervisors did not inform her that she was to receive a Merit Commendation Award in time to attend the ceremony in January 2004.  The Supreme Court has made it clear that the "anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414 (2006).  This requirement of "material adversity" separates serious harms from trivial ones, and thus

advances the purpose of the anti-retaliation provision by prohibiting only the employer actions "that are likely to deter victims of discrimination from complaining." Id. at 2415 (internal quotation omitted). "[N]ormally[,] petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id. (citation omitted). The failure to notify plaintiff of the awards ceremony is not sufficiently serious to constitute a materially adverse employment action. She has not made out a prima facie case on this claim.

Finally, we turn to plaintiff's contention that the retaliatory action against her was sufficiently severe so as to give rise to a cause of action for hostile work environment under Title VII. Although in some cases the facts establishing a claim for retaliation can also establish a claim for hostile work environment, they are distinct causes of action under Title VII. To sustain a hostile work environment claim, plaintiff must demonstrate that she was harassed on account of her religion and that this harassment was so "severe or pervasive" as to alter the conditions of her employment and create an abusive working environment. Faragher v. Boca Raton, 524 U.S. 775, 786 (1998). Harassment sufficient to support plaintiff's hostile work environment claim requires that she show the City's animus toward her religion. See Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994). A hostile work environment claim is thus premised on unwelcome conduct that establishes an intimidating or offensive work environment. West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d

Cir. 1995).  A plaintiff can bring a hostile work environment claim when she has suffered "discriminatory intimidation, ridicule, and insult."  <u>Meriter Sav. Bank v. Vinson</u>, 477 U.S. 57, 65 (1986).  In this case, she has put forward no evidence suggesting animus toward the Muslim religion.  She alleges no verbal abuse, offensive comments or symbols, physical threats or humiliation, or any other indication that the Police Department of Philadelphia was at all hostile to her or her faith.  As noted above, Commissioner Sylvester Johnson himself is a Muslim.

     Accordingly, we will grant the motion of the City of Philadelphia for summary judgment on Count II of plaintiff's complaint for retaliation and hostile work environment.

```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLIE WEBB                  :       CIVIL ACTION
                                :
          v.                    :
                                :
CITY OF PHILADELPHIA            :       NO. 05-5238
```

ORDER

AND NOW, this 12th day of June, 2007, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion for summary judgment of defendant City of Philadelphia to dismiss Counts I and II of plaintiff Kimberlie Webb's complaint is GRANTED; and

(2) judgment is entered in favor of defendant City of Philadelphia and against plaintiff Kimberlie Webb with respect to Counts I and II of plaintiff's complaint.

BY THE COURT:

/s/ Harvey Bartle III
C.J.